UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

DONNA DIMIZIO )
)
V. ) NO. 2:16-CV-6
)
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security )

# REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636, for a report and recommendation. Plaintiff's application for Supplemental Security Income ["SSI"] under the Social Security Act, 42 U.S.C. § 405, was denied following a hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 31 and 32].

## I.   Standard of Review

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor

resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

## II.     Sequential Evaluation Process

The applicable administrative regulations require the Commissioner to utilize a five-step sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step ends the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review poses five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's RFC, can he or she perform his or her past relevant work?
>
> 5. Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC — do significant

2

numbers of other jobs exist in the national economy which the claimant can perform?

20 C.F.R. § 404.1520(a)(4). A claimant bears the ultimate burden of establishing disability under the Social Security Act's definition. *Key v. Comm'r of Soc. Sec.*, 109 F.3d 270, 274 (6th Cir. 1997).

## III. Plaintiff's Vocational Characteristics

Plaintiff was 36 years of age, a "younger" individual under the Social Security Regulations, at the time of her alleged disability onset date of May 29, 2013. She has a high school education. All parties agree that she is incapable performing any past relevant work.

## IV. Evidence in the Record

Plaintiff's medical history is described in the Commissioner's brief [Doc. 33] as follows:

> Beginning in October 2012, and continuing every one to three months through February 2015, Plaintiff sought psychiatric care from Harold Elliott, M.D., whose treatment included medication and psychotherapy (Tr. 698-719, 865-893). Upon mental status examination, Dr. Elliott generally observed Plaintiff to be well-groomed and cooperative, with normal behavior, normal speech, comfortable/spontaneous affect and mood, normal thought form and content, normal perception, intact memory, adequate attention/concentration, intact ability to calculate, average intelligence, and adequate judgment (Tr. 700, 702, 705, 707, 709, 712, 715, 718, 866-867, 869, 871, 877, 880, 883, 886-887, 889-890, 892-893). At three appointments during the adjudicated period, Dr. Elliott observed Plaintiff's affect and mood to be blunted, panicked, anxious, depressed, or labile (Tr. 718, 874, 877). However, Plaintiff believed much of her symptoms to be situational, and Dr. Elliott agreed (Tr. 718-719, 865-893). He changed Plaintiff's medications in response to her reports of their effectiveness and side effects. *Id.* In January 2013, Dr. Elliott completed a medical source statement on Plaintiff's mental abilities to do work-related activities (Tr. 681-683). He opined that many of her abilities ranged from fair to poor due to stress reactivity, poor sleep, hypervigilance, irritability, and fatigue. *Id.*
> From February 2013 to November 2013, Plaintiff sought primary care

3

from Shanna Peterson, F.N.P., for maintenance of her chronic conditions (Tr. 725-734, 749-760). Examination showed Plaintiff was in no acute distress, with normal and appropriate affect and normal gait. *Id.* She was treated conservatively with medications and behavioral modifications. *Id.*

In February 2013, Harold Alison, M.D., a cardiologist, performed a cardiac catheterization due to Plaintiff's reports of chest pains and her multiple risk factors for coronary disease (Tr. 688). He assessed mild multi-vessel coronary artery disease. *Id.* In April 2013, her physical examination was unremarkable (Tr. 689). A chest x-ray showed no active heart or lung disease (Tr. 691). Dr. Alison assessed that her condition remained stable and advised her to proceed with conservative treatment (Tr. 688-690).

In June 2013, Tony Haley, M.D., performed an esophagogastroduodenoscopy (EGD) to evaluate Plaintiff's complaints of epigastric pain and GERD (Tr. 720, 739-740). The EGD showed some mild gastritis in the distal stomach (Tr. 720-721). At her follow-up after the EGD, Plaintiff's examination was normal – she was well-developed and well-nourished, with normal gait, station, muscle, strength, and range of motion (Tr. 736-737). Plaintiff was to return in two weeks to discuss the possibility of exploratory laparoscopy to find the source of her pain (Tr. 737). The record contains no further documentation from Dr. Haley.

In September 2013, Chad Sims, Ph.D., conducted a psychological consultative examination of Plaintiff at the request of the agency (Tr. 742-747). He noted Plaintiff had good hygiene, was appropriately dressed, had normal posture, and walked slowly with a limp (Tr. 742- 743). She had undergone surgery the night before to address an ingrown toenail and wore a medical boot to the evaluation (Tr. 743). Dr. Sims observed that Plaintiff appeared depressed, anxious, and tired, though she was oriented with fair eye contact and normal rate and clarity of speech (Tr. 745, 747). Her responses were coherent and easy to understand and her thought processes were clear and logical (Tr. 745). Dr. Sims opined that Plaintiff appeared capable of traveling independently, maintaining awareness of hazards and taking necessary precautions, and independently setting goals (Tr. 747). He opined that she had no more than mild impairments in social-relating, adapting to change, and long-term and remote memory functioning. *Id.* She had no impairment in her short-term memory functioning, was of average intelligence, and could follow both written and spoken instructions. *Id.* Dr. Sims diagnosed PTSD, panic disorder without agoraphobia, depressive disorder (not otherwise specified), and anxiety state (unspecified). *Id.* He assessed a current global assessment of functioning (GAF) score of 56-60. *Id.*

Later in September 2013, State agency medical consultant Reeta Misra, M.D., evaluated Plaintiff's claim at the initial level of review (Tr. 77-78). She concluded that the information in the file was insufficient to formulate an opinion about Plaintiff's RFC. *Id.* Also that month, State agency psychological consultant Karen Lawrence, Ph.D., determined that Plaintiff's affective and anxiety-related disorders resulted in no more than mild limitations in activities of daily living;

4

social functioning; or concentration, persistence, or pace; and found that she had experienced no episodes of decompensation of extended duration (Tr. 78). As such, Dr. Lawrence concluded that Plaintiff had no severe mental impairment (Tr. 79). At the reconsideration level of review, State agency psychological consultant Edward Sachs, Ph.D., reached the same conclusions as Dr. Lawrence and likewise found that Plaintiff had no severe mental impairment (Tr. 89-90).

At her cardiac follow-up in November 2013, Dr. Alison's physical examination of Plaintiff was normal (Tr. 860-861). Her coronary artery disease remained stable (Tr. 861). He advised Plaintiff to continue her current medication regimen and follow-up in one year. *Id.*

In December 2013, Marianne Filka, M.D., performed a physical consultative examination of Plaintiff at the request of the agency (Tr. 761-767). Plaintiff weighed 178 pounds and was 61.5 inches tall, resulting in a body mass index (BMI) of 33.08 (Tr. 765). Her blood pressure was 119/73. *Id.* Her physical examination showed normal joint appearance, full strength, and full range of motion throughout (Tr. 765). There was some joint tenderness and tenderness over the cervical spine and low back. *Id.* Her gait was slow, but otherwise normal, and she did not use an assistive device to ambulate. *Id.* Posture changes were done slowly and without evidence of difficulty, although Plaintiff complained of dizziness. *Id.* Her mental status examination was unremarkable (Tr. 766). Dr. Filka opined that due to Plaintiff's arthralgias and pain, she could lift, push, pull, or carry up to 30 pounds occasionally and up to 20 pounds frequently (Tr. 766-767). She opined that Plaintiff should avoid working in an area where her faintness and history of syncope would be a safety risk (Tr. 767).

In March 2014, at the reconsideration level of review, State agency medical consultant John Mather, M.D., opined that during an 8-hour workday, Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for about 6 hours, and sit for about 6 hours, with an unlimited ability to push and pull (Tr. 92). She could occasionally balance and climb ladders, ropes, or scaffolds; frequently stoop and climb ramps or stairs; and had no limits on her ability to kneel, crouch, or crawl (Tr. 92-93). As for environmental limitations, she was to avoid concentrated exposure to extreme cold and extreme heat and even moderate exposure to hazards (machinery, heights, etc.) (Tr. 93).

Ralph Mills, M.D., an orthopedist, evaluated Plaintiff on three occasions – March 2014, November 2014, and March 2015 – for her complaints of hand pain, numbness and tingling in both wrists, right shoulder pain, elbow pain, and hip pain (Tr. 896-908). At her examination in March 2014, Plaintiff's hands showed no atrophy, normal range of motion, and normal grip strength, though she had positive Tinel's and Phalen's signs bilaterally (Tr. 898). She did not have any tenderness in her elbows (Tr. 898). Her range of motion was full and Tinel's was negative at the elbow. *Id.* Her shoulder and neck ranges of motion were normal. *Id.* An October 2014 electromyography (EMG) nerve conduction study was normal and revealed no evidence of radiculopathy in either upper limb (Tr. 900,

5

911). In March 2015, Plaintiff had multiple areas of tenderness and Dr. Mills diagnosed fibromyalgia (Tr. 907-908). He recommended physical therapy and prescribed Medrol Dosepak and Hydrocodone (Tr. 908). He ordered x-rays of Plaintiff's cervical spine, which showed well-preserved joint spaces, normal alignment, and no fracture or dislocation (Tr. 908, 912). He instructed her to return for follow-up after she had seen physical therapy (Tr. 908).

In July 2014, Brent Welch, M.D., a gastroenterologist, evaluated Plaintiff's reports of vomiting and abdominal pain (Tr. 775-778). She stated her symptoms had started a few weeks prior and were alleviated by fasting (Tr. 775). Physical examination revealed that Plaintiff was well-nourished and mildly obese (Tr. 777). Her abdomen was tender, but the examination was otherwise normal. *Id.* Her musculoskeletal, neurologic, and psychiatric examinations were unremarkable. *Id.* Dr. Welch ordered laboratory workup, with instructions to follow-up after the testing (Tr. 770-774, 777-778). No further records from Dr. Welch were submitted.

Plaintiff established care with State of Franklin OB/GYN Specialists in September 2014 (Tr. 933-936). Her physical examination was normal (Tr. 934-935).

In early October 2014, Plaintiff sought a pre-operative cardiac clearance from Dr. Alison (Tr. 848). An electrocardiogram (EKG) study showed normal sinus rhythm (Tr. 850, 859). Physical examination was normal (Tr. 850). Dr. Alison cleared Plaintiff to undergo surgery and instructed her to return in one year (around October 2015) (Tr. 852).

Mid-October 2014, Plaintiff went to the emergency room with complaints of chest pain, panic attack, numbness in her hands and feet, and feeling faint (Tr. 785). She was in mild pain distress and was anxious, but her examination was otherwise within normal limits (Tr. 787). An EKG study was normal. *Id.* The doctor assessed chest pain and discharged Plaintiff home (Tr. 788). About 10 days later, Plaintiff returned to the emergency room complaining of high blood sugar and weakness (Tr. 780-781). Physical examination was within normal limits (Tr. 782). The doctor assessed diabetes mellitus type II, hyperglycemia, and weakness. *Id.* Plaintiff was treated and discharged home in stable condition. *Id.*

At her follow-up with Dr. Alison at the end of October 2014, he noted Plaintiff had recently been treated for transient left-sided weakness, with a carotid Doppler study showing 50 to 70 percent stenosis in the right carotid artery and less than 50 percent in the left carotid artery (Tr. 831). Plaintiff denied having any neurological symptoms, chest pains, shortness of breath, or palpitations. *Id.* Her physical examination was normal (Tr. 833-834). Though she reported being nervous/anxious, upon mental status examination, she had a normal mood and affect, normal behavior, and normal judgment and thought content (Tr. 834). Dr. Alison instructed Plaintiff to return in six months (Tr. 840).

In March 2015, Gamal Boutros, M.D., a neurologist, evaluated Plaintiff's history of transient ischemic attacks (TIAs) (Tr. 894-895). Her most recent TIA in 2014 caused transient left-sided weakness and headaches (Tr. 894). Upon

6

examination, Plaintiff was alert and oriented, had a good fund of knowledge, and had normal cognition, memory, speech, language, thought, mood, affect, and attention. *Id.* Her blood pressure was 110/83. *Id.* She had normal strength in the upper and lower extremities. *Id.* Range of motion was full in the cervical and lumbar spine, shoulders, knees, wrists, hips, and ankles. *Id.* Muscle tone was normal. *Id.* There was no point tenderness or trigger points. *Id.* Deep tendon reflexes and sensation were decreased. *Id.* Plaintiff had a wide-based gait and was unable to walk on tiptoe and heel or stand on one foot. *Id.* Rhomberg was negative. *Id.* Dr. Boutros diagnosed peripheral vascular disease, carotid stenosis, neuropathy, and migraine. *Id.* He thought that Plaintiff was orthostatic and doubted that she was experiencing TIAs (Tr. 895). He ordered an MRI scan and a magnetic resonance angiogram (MRA) scan and instructed Plaintiff to return in two months. *Id.* The record contains no further documentation from Dr. Boutros.

[Doc. 33, pgs. 3-9].

Plaintiff's hearing took place on June 4, 2015. Plaintiff testified extensively (Tr. 42-65). Plaintiff described her educational and work background. She then testified as to her medical history with respect to both her physical and mental condition. She discussed her treatment relationship with Dr. Elliott, her psychiatrist, as well as various other healthcare providers. She testified as to her diminished ability to stand for more than 10 to 15 minutes, and her ability to lift no more than five to ten pounds. She stated she could only sit for 20 to 30 minutes. She said she no longer was able to grip a steering wheel and was thus unable to drive an automobile. She described her various conditions and some of the medications she takes for them.

After listening to the plaintiff's testimony, the ALJ took the testimony of Kristy Lilly, a vocational expert ["VE"]. The ALJ first asked the VE to assume a person with the limitations set out in the report of Dr. John Mather, a State Agency physician who reviewed the plaintiff's medical records. Dr. Mather opined that the plaintiff could lift and carry up to 20 pounds occasionally and 10 pounds frequently. He also found that she

7

could stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday (Tr. 92). In other words, Dr. Mather found that the plaintiff had the exertional capacity to perform "light" work under the Social Security Regulations. Dr. Mather also opined that the plaintiff could frequently climb ramps/stairs; occasionally climb ladders/ropes/scaffolds; occasionally balance; frequently stoop; was unlimited in kneeling, crouching and crawling; and should avoid concentrated exposure to extreme cold and heat; and avoid even moderate exposure to hazards such as machinery and heights (Tr. 93). When asked if there were jobs a person with the limitations described by Dr. Mather could perform, the VE identified the jobs of general cashier, retail mailing clerk, and mail sorter (Tr. 68-69). There is no dispute that the numbers of such jobs identified by Ms. Lilly would constitute a substantial number of jobs under the applicable regulations.

The ALJ then asked Ms. Lilly to also assume that the plaintiff had the non-exertional limitations found by Dr. Chad Sims, a clinical psychologist who performed a mental status examination on behalf of the Commissioner. Dr. Sims, found that plaintiff was not more than mildly impaired in any area of mental functioning (Tr. 242-247). With those limitations, Ms. Lilly opined that the plaintiff could still perform the jobs she identified in response to the earlier question (Tr. 69).

Then, Ms. Lilly was asked by the ALJ to assume plaintiff had the non-exertional limitations opined by her treating psychiatrist, Dr. Harold W. Elliott (Tr. 681-683). If she had those limitations, the VE stated there would be no jobs (Tr. 70).

8

## V. ALJ's Findings

On June 18, 2015, the ALJ filed his hearing decision. He made the following findings of fact and conclusions of law:

1. The plaintiff had not engaged in substantial gainful activity since May 29, 2013, the application date (Tr. 16).

2. The plaintiff had severe impairments of multi-joint arthralgia, fibromyalgia, and diabetes with neuropathy (Tr. 16). The ALJ found that the plaintiff did not have a severe mental impairment. In this regard, he discussed the plaintiff's treatment history with Dr. Elliott. He also discussed the findings and opinion of Dr. Sims, the consultative examiner. The ALJ found no more than mild limitations in activities of daily living; social functioning; and concentration, persistence or pace. He gave Dr. Sims' opinion great weight. He found that Dr. Elliott's opinion was entitled to no evidentiary weight because it was prepared prior to plaintiff's alleged onset date, albeit by less than four months (Tr. 16-19).

3. The plaintiff did not have an impairment or combination of impairments which met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 19).

4. The plaintiff had the residual functional capacity ["RFC"] to perform light work, with impairments of being able to only occasionally climb ladders, ropes and scaffolds; occasionally balance; frequently climb ramps and stairs; and to frequently stoop. Also she was to avoid concentrated exposure to extreme heat or cold, or moderate exposure to hazards such as machinery, heights, etc. (Tr. 20). The ALJ also discussed

the records provided from treating and non-treating sources regarding plaintiff's physical condition. He gave no weight to the State Agency medical consultant at the initial level, but great weight to the State Agency doctor who evaluated the plaintiff at the reconsideration level. He also gave great evidentiary weight to the opinion of Dr. Filka, the consultative examiner (Tr. 20-25).

5. The ALJ found that the plaintiff could not perform any past relevant work (Tr. 25).

6. The ALJ found that the plaintiff was 36 years old, a "younger" individual, at the time she filed her application (Tr. 25).

7. The ALJ found that the plaintiff had a high school education (Tr. 25).

8. He found that transferability of job skills was not material because the Medical-Vocational Guidelines when used as a framework for decision making indicted the plaintiff was "not disabled" with or without transferrable skills (Tr. 25).

9. At Step Five, the ALJ found, based upon the testimony of Ms. Lilly, the VE, that there were a significant number of jobs the plaintiff could perform. Accordingly, the found that the plaintiff was not disabled (Tr. 25-26).

## VI. Analysis

Plaintiff raises three assignments of error in the adjudication of this case by the Commissioner. The first two, alleged error in failing to find a severe mental impairment and alleged error in failing to evaluate and accord proper weight to the reports and opinions of treating medical sources, are somewhat related in this case and will be discussed together later in this report and recommendation.

10

The third asserted error is that the ALJ erred in evaluating plaintiff's credibility on non-symptomatic and non-medical issues such as activities of daily living, failure to follow up on recommendations for treatment, and "the use of boilerplate language." [Doc. 31, pg. 16]. Plaintiff bases this argument on the enactment by the Commissioner of a new Social Security Ruling ["SSR"] on March 28, 2016. The new SSR, 16-3p, supersedes SSR 96-7p, and in doing so eliminates the use of the term "credibility" in the Agency's regulatory policy. The stated rationale in SSR 16-3p is because the underlying regulations "do not use this term." 2016 WL 1119020 at *1 (March 16, 2016). Also, in the regulation the Commissioner states that by doing this, "we clarify that subjective symptom evaluation is not an examination of the individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." *Id*. Notably, the language of the regulations themselves on subjective symptom evaluation, including 20 C.F.R. § 416.929 with respect to Supplemental Security Income, remain as they were. For this reason, a plaintiff's daily activities are still part of information an ALJ should consider. *See,* 20 C.F.R. § 416.929(c)(3)(i). Likewise, the new SSR also allows consideration of a failure to follow prescribed treatment. *Id.* at 8. However, the new SSR advises the adjudicators to take into account legitimate reasons for why reported daily activities would not be consistent with a person being disabled, or why the person did not follow treatment advice. Also, when evaluating whether the symptoms correspond to the evidence, "[t]he determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any

11

subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at 9.

Plaintiff argues that the new standard required by SSR 16-3p should be applied retroactively to plaintiff's claim, which was decided by the ALJ many months before the new SSR took effect. However, that argument is foreclosed by the holding of District Judge Mattice in the case of *Cameron v. Colvin*, 2016 WL 4094884, at *2 (E.D., Tenn. Aug. 2, 2016) which held "Because the text of SSR 16-3p does not indicate the SSA's intent to apply it retroactively, the Court declines to do so." *Id.*

Plaintiff also argues that even under SSR 96-7p, the ALJ improperly drew inferences from plaintiff's failure to seek or pursue treatment without inquiring as to why plaintiff did not do so. In fact, the ALJ was very familiar with the plaintiff's many visits to various doctors to obtain treatment, and in no small measure this was why he found the plaintiff to have the limited RFC he ultimately found. His findings relating to her failing to follow advice for more treatment were not out of line with the credibility analysis he was required to engage in at the time of this adjudication. He was not playing doctor. His credibility findings, at the time they were made, were of the type that the Sixth Circuit had held to be virtually "unchallengeable." *Payne v. Comm'r of Soc. Sec.*, 402 Fed. Appx. 109, 112-13 (6th Cir. 2010). The Court finds that the ALJ did not err in the process by which he evaluated plaintiff's subjective complaints.

Plaintiff's also asserts that the ALJ erred "by according improper weight to the Consultative Examinations [*sic*] and by failing to follow the Treating Physician Rule." [Doc. 31, pg. 3.]. Plaintiff sets forth a table of all of the various physicians and

12

psychologists who treated the plaintiff, consultatively examined her, or examined her medical records [Doc. 31, pgs. 4-5]. With respect to treating sources, plaintiff complains that the ALJ did not state the weight given to any of them, with the sole exception of Dr. Harold Elliott, plaintiff's treating psychiatrist. With regards to Dr. Elliott, as plaintiff's table points out, the ALJ stated "[t]he opinion of Dr. Elliott set out in Exhibit 22F (Tr. 681-683) was prepared prior to the amended alleged onset date and is not assigned evidentiary weight." (Tr. 19). Plaintiff points out that the ALJ is required to explain the weight given to the "opinions" of acceptable medical sources under the regulations, such as § 416.927. She also asserts that, with respect to the treating doctors, the ALJ failed to follow the treating physician rule, where the opinion of a treating acceptable medical source is entitled to controlling weight if the opinion is "well-supported by medically accepted clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence" in the record. *See*, § 416.927(d)(2). If not accorded controlling weight, the treating source's opinion must be considered and evaluated based upon factors listed in § § 416.927(c)(2)(i) and (c)(2)(ii). Plaintiff relies upon a plethora of cases, including *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

In *Wilson*, the Sixth Circuit discussed the treating source rule in the regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination. The court noted that the regulation expressly contains a "good reasons" requirement. *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)). In the recent case of *Cole v.*

13

*Astrue*, 661 F.3d 931 (6th Cir. 2011), the Sixth Circuit went into great detail about how ALJ's must evaluate testimony of a treating physician. In this regard, the Court stated:

> [T]he Commissioner has mandated that the ALJ ''will'' give a treating source's opinion controlling weight if it ''is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record.'' 20 C.F.R. § 404.1527(d)(2). If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: ''the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'' *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004) (citing 20 C.F.R. § 404.1527(d)(2)).
>
> Importantly, the Commissioner imposes on its decision makers a clear duty to ''always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'' 20 C.F.R. § 404.1527(d)(2). Those good reasons must be ''supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'' Soc. Sec. Rul. No. 96–2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996). This requirement is not simply a formality; it is to safeguard the claimant's procedural rights. It is intended ''to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'' *Wilson,* 378 F.3d at 544.

*Id.* at 937.

It is thus not enough for the ALJ to have substantial evidence supporting his or her decision to justify giving little or no weight to a treating source. The Commissioner's regulations give the claimant a "procedural right" to understand from reading the hearing decision why their doctor's opinion was not enough for them to be found to be disabled. In explaining a decision to discount a treating source opinion, the ALJ must do more than state that the opinion of the treating physician disagrees with the opinion of a non-treating

14

physician, *see Hensely v. Astrue*, 573 F.3d 263, 266-67 (6th Cir. 2009), or that the objective medical evidence does not support that opinion, *see Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552-52 (6th Cir. 2010).

This deference, however, extends only to treating sources. Non-treating source opinions are not entitled to any specific consideration or presumption but are to be equally analyzed under the same level of scrutiny. *See, e.g.*, 20 C.F.R. § 404.1527(b)-(c) ("Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion."); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379 (6th Cir. 2013) (the failure to "apply the same level of scrutiny to the opinions of the consultative doctors on which he relied" called into question the ALJ's analysis).

The Commissioner agrees that the regulations and these cases require the ALJ to explain the weight given to the medical opinions. However, she correctly points out that the vast majority of these treating sources, save Dr. Elliott, did not give an opinion to be accorded weight or explained by the ALJ. A "medical opinion" is "a statement about what you can still do despite your impairments." §§ 416.913(b)(6); 416.913 (c)(1); and 416.913(c)(2). Also, § 416.927(a)(2) states that "medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s)...." Once again, none of these treating doctors, save Dr. Elliott, offered an opinion to be weighed. Of course, they are still relevant evidence that the ALJ should (and did) consider in evaluating the other evidence in making the findings he had to make. In this case, the treating physician rule

15

applies only to Dr. Elliott.

The Commissioner asserts that the plaintiff "does not contest" the ALJ's evaluation" of any of the actual opinions offered [Doc. 33, pg. 17]. However, Dr. Elliott is set out in plaintiff's table of medical sources, and it states that it was accorded no evidentiary weight. This is an assertion of error in the making of that finding, even if somewhat unartfully raised.

The Court is of the opinion that the ALJ's reason for giving the opinion no evidentiary weight, because it was rendered before the claim was filed, is an insufficient reason under the applicable regulations and the cases cited above. It is true that the Commissioner identifies evidence (other than the fact that the opinion was rendered less than four months before the application for benefits was filed), which she asserts would have supported a finding by the ALJ to give little weight to the opinion of Dr. Elliott. However, as highlighted by *Cole*, *supra*, at 397, "[t]he Commissioner imposes this duty [to state such reasons] *on its decision makers*," and not in a *post hoc* argument by the Commissioner. *Id.* (emphasis added). This is a procedural right of the plaintiff and a necessity for proper review by this Court for the adjudicator *himself* to state sufficiently specific reasons for the weight given to a treating source. Also, the Court notes that there was other evidence mentioned by the ALJ to support his finding that the plaintiff did not have a severe mental impairment. However, that does not cure the failure to give good reasons for the weight given to Dr. Elliott. The Commissioner's position is not substantially justified.

The plaintiff's final assertion of error is that the ALJ erred in finding that the

16

plaintiff did not have a severe mental impairment. The determination of that issue will have to wait until the ALJ explains the lack of weight given to Dr. Elliott.

**VII. Conclusion**

The Court recommends that the case to be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for a more appropriate explanation in accordance with the cases cited above as to the weight given to the opinion of Dr. Elliott. Accordingly, it is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 31] be GRANTED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 32] be DENIED.[1]

Respectfully submitted,

s/ Clifton L. Corker
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).